UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| AARON HINDS, on behalf of himself and all others similarly situated,<br><br>*Plaintiff*,<br><br>v.<br><br>KKR & CO INC. and INSTRUCTURE, INC.,<br><br>*Defendants*. | Case No. ______________<br><br>CLASS ACTION COMPLAINT<br><br>DEMAND FOR JURY TRIAL |

## CLASS ACTION COMPLAINT

Plaintiff AARON HINDS ("Plaintiffs"), on behalf of himself and all others similarly situated, brings this Class Action Complaint against Defendants KKR & CO INC. ("KKR") and INSTRUCTURE, INC. ("INSTRUCTURE") (collectively, the "Defendants"), for violations of state and common laws set forth herein in connection with Defendants' failures to allow for the unlawful breach of personally identifiable and sensitive information during the applicable statutory period and continuing through the present day ("Class Period").

Plaintiff makes the following allegations based upon personal knowledge as to himself, media reporting, warnings from universities and schools, as well as upon information and belief and investigation of his counsel as follows:

## SUMMARY OF THE CASE

1. Plaintiff brings this class action lawsuit against Defendant KKR and Instructure for their collective failure to properly secure and safeguard personally identifiable information ("PII") within their "Canvas" education software product, including but not limited to: Plaintiff's and Class members' names, email addresses, Student ID numbers, private messages, enrolled courses, confidential messages to teachers, and other sensitive information which has still yet to be disclosed (the "Data Breach"). Canvas is the most popular educational software in the country, used by over 41% of K-12, secondary education, graduate educational and ministerial institutions in the United States.[1] One of the thousands of institutions impacted was University of Denver, where Plaintiff was a student, and which has to take Canvas offline because of the Data Breach.

[1] https://www.9news.com/article/news/local/colorado-news/colorado-colleges-affected-by-hackers-breaching-canvas/73-0bcbeadf-b4bc-4455-8ae6-dc49cd9b2f00, (last accessed May 7, 2026).

2. Instructure, which owned Canvas, was a publicly traded company (NYSE: INST) that was acquired by the global investment firm, KKR, on July 7, 2024.[2] Because of the widespread use of Canvas, KKR acquired Instructure for over $4.8 billion stating, "KKR will support Instructure as it increases investment in technology and innovation across its leading, global learning platform including [] Canvas."[3] However, despite the significant investment into Canvas, Instructure and KKR that contributed to Canvas' technology, Infrastructure and KKR entirely failed to invest the time and resources necessary to protect the PII of Plaintiff and Class members. Additionally, the schools and institutions which use Canvas failed to act as third-party fiduciaries for the sensitive data and PII of the many students who are the livelihoods of their educational facilities. The information compromised in the Data Breach was not merely from college students or older graduate level students, but from children who used the Canvas platform in order to receive their education. This is even more true given the shifts to online and remote learning after the onset of COVID-19 in March of 2020. However, Instructure and KKR failed their customers and the educational facilities failed their students.

3. Resultingly, the PII of over 275 million students and teachers were compromised exposed to the world via the "dark web" by the notorious and infamous prolific hacking group called ShinyHunters. In fact, an image of the ransom note posted by ShinyHunters was collected from the Canvas login page and appeared as follows:[4]

---

[2] https://www.instructure.com/press-release/instructure-to-be-acquired-by-KKR, (last accessed, May 7, 2026).

[3] *Id.*

[4] https://krebsonsecurity.com/2026/05/canvas-breach-disrupts-schools-colleges-nationwide/, (last accessed May 8, 2026).




4. Initially, Instructure said that the information stolen included "certain identifying information such as names, email addresses and student ID numbers, as well as messages among users."[5] In a statement on May 6, Instructure misrepresented that their platform was fully operational, that there was no evidence of unauthorized activity, and that "[a]t this stage, we believe the incident has been contained."[6] Instructure was even bold enough to say "[t]his will be

[5] *Id.*
[6] https://status.instructure.com/incidents/9wm4knj2r64z, (last accessed May 8, 2026).

our final update via this statues update via this status page for this incident" on the same day, May 6, and marked the incident as "RESOLVED."[7]

5. Naturally, the incident was not resolved.

6. As reported, on the very next day, Canvas' login pages were replaced with ransom demands from ShinyHunters before Instructure pulled Canvas offline entirely and replaced it with a status page that stated "Canvas is currently undergoing scheduled maintenance. Check back soon."[8] This seems, at best, to be misleading given the timing. At worst, it is a deliberate attempt to cover up the mass exposure of PII of children and other students which was leaked as part of the Data Breach. To make matters worse, the victims of the Data Breach still have not been directly informed by KKR or Instructure about the Data Breach.

7. All in all, ShinyHunters claims billions of messages between students (who may be minors) and other users have been exposed as part of the Data Breach.

8. According to sources, numerous educational facilities have already attempted to pay ransoms to ShinyHunters in order to regain access to Canvas.[9] And, according to Dipan Mann, founder and CEO of the security firm Cloudskope, it is unacceptable that Instructure called Canvas' takedown as "scheduled maintenance" and stated that ShinyHunters actually showed they had breached Canvas as far back as May 1st.[10] However, Steve Proud, the Chief Information

---

[7] *Id.*

[8] https://krebsonsecurity.com/2026/05/canvas-breach-disrupts-schools-colleges-nationwide/, (last accessed May 8, 2026).

[9] *Id.*

[10] *Id.*

Security Officer of Instructure, claimed on May 2nd that the attack had been contained – which was entirely false.[11]

9. The storage of this PII, as well as the failure to adequately protect it, and the misrepresentations about its security is a critical failure by Instructure and KKR which will continue impact victims for a lifetime – especially vulnerable targets like children. And data breaches of this type of software is entirely foreseeable, as PowerSchool, a similar software, was breached just recently on December 28, 2024 resulting in the exposure of PII for over 62 million students and 9.5 million teachers across the country. At the time, PowerSchool was the largest breach of children's data in United States history – but this Data Breach far surpasses it.

10. According to ShinyHunters, the data was stolen using "Canvas data export features, including DAP queries, provisioning reports and user APIs" which allowed ShinyHunters to harvest hundreds of gigabytes of user records, messages, and enrollment data – which, given how little Instructure has revealed on this Data Breach, could mean that the PII which was compromised was significantly more sensitive than first announced.

11. Plaintiff, on behalf of himself and all others similarly situated, brings this Action for all available damages including actual damages, injunctive relief, reasonable costs and attorney's fees, pre- and post-judgment interest, and all other relief that this Court deems just and proper.

## JURISDICTION AND VENUE

12. This Court has subject matter jurisdiction pursuant to the Class Action Fairness Act of 2005 ("CAFA"), 28 U.S.C. § 1332(d). The amount of controversy exceeds the sum of $5,000,000 exclusive of interests and costs, there are more than 100 putative Class members, and

[11] *Id.*

minimal diversity exists because one or more putative Class members are citizens of a different state than a Defendant. On an annual basis, six million students use Canvas – but the fact that over 275 million student and teacher accounts were compromised suggests that either all of Canvas' retained PII was compromised or numerous years' worth of it.

13. This Court has personal jurisdiction over KKR because KKR maintains its principal place of business in New York, New York – and it operates as the parent company for Instructure. Furthermore, KKR intentionally availed itself of this jurisdiction by marketing, employing individuals, and providing services in New York; and Instructure is registered as a foreign corporation in New York with significant activities through its Canvas platform at numerous schools which were also impacted by the Data Breach.

14. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) because Defendants KKR and Instructure operates in this District and a substantial part of the events, acts and omissions giving rise to Plaintiff's claims occurred in this District.

## PARTIES

### PLAINTIFF

***Plaintiff Aaron Hinds***

15. Plaintiff Hinds is, and at all times mentioned herein, was an individual citizen of the state of New Jersey; but, his data was collected by Canvas while as a student at University of Denver in Denver, Colorado and was also maintained while he was a resident of Boston, Massachusetts and New York, New York. Plaintiff is a former student and a graduate student at University of Denver who reasonably believes that his PII was compromised in the Data Breach.

## DEFENDANTS

***Defendant KKR & Co. Inc.***

16. Defendant KKR is a global investment firm with its headquarters located in New York, New York.

***Defendant Instructure, Inc.***

17. Defendant Instructure, Inc. is a U.S. based education technology system best known for developing Canvas, a widely used learning management system that helps schools, universities, and organizations manage casework, assignments, and online learning from its headquarters located in Salt Lake City, Utah.[12]

## FACTUAL ALLEGATIONS

***Defendant's Businesses and Collection of Private Information***

18. In the course of doing business, Canvas acquires a significant amount of highly valuable private information from its students, alumni, and staff, including the acquisition of the PII of Plaintiff and the Class members.

19. As a condition of providing the PII, Plaintiff and Class members entrusted that Canvas would only use their data for business purposes in a way that was safe and secure. By obtaining, collecting, using, and deriving a benefit from Plaintiff's and Class members' PII, Canvas and its parent company (KKR) as well as Instructure assumed legal and equitable duties and knew that it was responsible for ensuring the security and safety of Plaintiff's and Class members' PII to protect it from unauthorized disclosure and exfiltration.

[12] https://www.bleepingcomputer.com/news/security/instructure-confirms-data-breach-shinyhunters-claims-attack/, (last accessed May 8, 2026).

20. Plaintiff and the Class members relied on Defendant to keep their PII confidential and securely maintained, and only to make *authorized* disclosures of this information, which Defendant failed to do.

***The Data Breach***

21. On May 1, 2026, Defendants confirmed that the Data Breach had taken place and that Defendant first became aware of the Data Breach on some unknown date.

22. Defendants' knowledge of the Data Breach did not happen because Defendants were not adequately monitoring its systems for breaches; but, rather, because became aware of the Data Breach because a notorious hacking group, ShinyHunters, posted on the dark web and claimed to access Canvas' database in an effort to extract sensitive information and a ransom. The instructions on ShinyHunters' extraction website appeared as follows:



23. Defendants' response to the Data Breach has been woefully insufficient. *First*, Defendants have yet to disseminate notification letters to victims so that those unaware of the Data Breach can take action to protect themselves (i.e. freezing credit reports, etc.). This will hamstrung millions of people (including the parents of children) who entrusted Canvas with their childrens' PII only to have it compromised, because there are an untold number of victims who have no idea that they are in fact victims of the Data Breach; this is compounded by the fact that Defendants have been misleading about the containment of the Data Breach. *Next*, Defendants have offered zero remediation for the Data Breach whatsoever – so all of the costs of taking preventative action, such as paying for credit monitoring, are costs that are borne by the victims as opposed to the billion dollar corporate Defendants. *Finally*, Defendants have yet to disclose the full nature of the breach and whether the information that Canvas still has in its control is now in fact secure. This leaves victims with zero reassurance that Defendants has taken steps to protect their PII from being exposed yet again due to Defendants insufficient cybersecurity apparatus.

24. On information and belief, the PII compromised in the files accessed by hackers was not encrypted. This can also be inferred given that the hacker was able to access the data that was listed as compromised in the reporting on the data Breach.

25. Moreover, the removal of PII from Defendant's systems demonstrates that this cyberattack was targeted by the hacker due to Defendant's status as a large software provider for educational institutions and their employers which house sensitive PII. Armed with this PII, data thieves, like the hacker in this Action (as well as downstream purchasers of the stolen PII), can commit a variety of crimes, including: abusing Student ID numbers to impersonate students on university campuses (especially since they have those students' names and school email addresses), names of children and associated information which should never be released to the

public, and private messages to teaching and educational professionals which could be highly sensitive and personal. To date, victims cannot even trust that the PII compromised in the Data Breach is sufficiently disclosed; this means that other "application data," as explained above, could contain information like government ID's (*e.g.* Social Security numbers or Tax IDs) and could very well lead to the opening new financial accounts in Class members' names, taking out loans in Class members' names, using Class members' information to obtain government benefits, filing fraudulent tax returns using Class members' tax identification information, obtaining driver's licenses in Class members' names but with a different photograph, and giving false information to police during an arrest.

26. Due to Defendant's flawed security measures and incompetent response to the Data Breach, Plaintiff and the Class members now face a present, substantial, and imminent risk of fraud and identity theft and must deal with that threat forever.

27. Despite widespread knowledge of the dangers of identity theft and fraud associated with cyberattacks and unauthorized disclosure of PII, and despite Defendant's generous operating budget, Defendant provided unreasonably deficient protections prior to the Data Breach, including but not limited to a lack of security measures for storing and handling PII, as well as inadequate employee training regarding how to access, oversee the protection, handle and safeguard for this sensitive set of information.

28. Defendant failed to adequately adopt and train its employees and third-parties on even the most basic of information security protocols, including storing, locking, encrypting and limiting access to current and former consumers and employees' highly sensitive PII; implementing guidelines for accessing, maintaining, and communicating sensitive PII; and protecting sensitive PII by implementing protocols on how to utilize such information.

29. Defendant's failures caused the unpermitted disclosure of Plaintiff's and Class members' PII to an unauthorized third-party cybercriminal and put Plaintiff and Class members at serious, immediate, and continuous risk of identity theft and fraud.

30. The Data Breach that exposed Plaintiff's and Class members' PII was caused by Defendant's violation of its obligations to abide by best practices and industry standards concerning its information security practices and processes.

31. Defendant, despite being a technologically advanced organization, failed to comply with basic security standards or to implement security measures that could have prevented or mitigated the Data Breach.

32. Defendant failed to ensure that all personnel with access to its current/former consumers' PII were properly trained in retrieving, handling, using and distributing sensitive information. Further, there have been no assurances offered by Defendant that all personal data or copies of the PII at issue were either recovered, destroyed, or otherwise protected by an enhanced data security protection apparatus.

***The Breach Was Foreseeable***

33. Defendant has significant obligations created by industry standards, common law, and its own promises and representations to keep PII confidential and to protect it from unauthorized access and disclosure.

34. Plaintiff and Class members provided their PII to Canvas with the reasonable expectation and mutual understanding that a sophisticated corporation like Defendants would comply with its obligations to keep such information confidential and secure from unauthorized access.

35. Defendant's data security obligations were particularly acute given the substantial increase in ransomware attacks and/or data breaches in various industries (especially including the education services industry) preceding the date of the Data Breach – including PowerSchool, Illuminate, and others.

36. Defendant was aware of the risk of data breaches because such breaches have dominated the headlines in recent years.

37. Cyberattacks have become so notorious that the Federal Bureau of Investigation and U.S. Secret Service have issued a warning to potential targets, so they are aware of, and prepared for, a potential attack.

38. PII is of great value to hackers and cybercriminals, and the data compromised in the Data Breach can be used in a variety of unlawful manners. PII can be used to distinguish, identify or trace an individual's identity. This can be accomplished alone or in combination with other personal or identifying information that is connected or linked to an individual, such as the information compromised in the Data Breach.

39. Given the nature of the Data Breach, it is foreseeable that the compromised PII can (and likely will) be used by hackers and cybercriminals in a variety of different ways.

40. Cybercriminals who possess the Class members' PII can readily obtain Class members' tax returns or open fraudulent credit card or other types of accounts in the Class members' names.

41. The increase in such attacks, and attendant risk of future attacks, was widely known.

42. As such, this specific Data Breach was foreseeable. Defendant was cognizant of data breaches because of how common and high-profile data breaches have become with respect to consumer-facing businesses such as Defendant.

***Defendant Failed to Follow FTC Guidelines, COPPA and Industry Standards***

43. Experts studying cybersecurity routinely identify businesses as being particularly vulnerable to cyberattacks because of the value of the data which they collect and maintain. The reason this data is so valuable is because it contains PII, which can be sold and weaponized for purposes of committing various identity theft-related crimes. It is well-known that, because of the value of this data and PII, businesses that collect, store, maintain, and otherwise utilize or profit from PII must take necessary cybersecurity safeguards to ensure that the data they possess is adequately protected.

44. Government agencies also highlight the importance of cybersecurity practices. For example, the Federal Trade Commission ("FTC") has promulgated numerous guides for businesses which highlight the importance of implementing reasonable data security practices.

45. According to the FTC, the need for data security should be factored into all business decision-making.

46. In 2016, the FTC updated its publication, Protecting Personal Information: A Guide for Business, which established cyber-security guidelines for businesses.

47. The guidelines note that businesses should protect the personal information that they keep; properly dispose of personal information that is no longer needed; encrypt information stored on computer networks; understand their network's vulnerabilities; and implement policies to correct any security problems.

48. The guidelines also recommend that businesses use an intrusion detection system to detect and expose a breach as soon as it occurs; monitor all incoming traffic for activity indicating someone is attempting to hack the system; watch for large amounts of data being transmitted from the system; and have a response plan ready in the event of a breach.

49. The FTC further recommends that companies not maintain PII longer than is needed for authorization of a transaction; limit access to sensitive data; require complex passwords to be used on networks; use industry-tested methods for security; monitor for suspicious activity on the network; and verify that third-party service providers have implemented reasonable security measures.

50. The FTC has brought enforcement actions against businesses for failing to adequately and reasonably protect consumer data, in some cases treating the failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential data as an unfair act or practice prohibited by Section 5 of the Federal Trade Commission Act ("FTCA"), 15 U.S.C. § 45. Orders resulting from these actions further explicate and clarify the measures businesses must take to meet their data security obligations.

51. Defendant failed to properly implement some or all of these (and other) basic data security practices.

52. Defendant's failure to employ reasonable and appropriate measures to protect against unauthorized access to PII constitutes an unfair act or practice prohibited by Section 5 of the FTC Act, 15 U.S.C. § 45.

53. Defendant was at all times fully aware of its obligation to protect PII. Defendant was also aware of the significant repercussions that would result from its failure to do so.

54. Experts studying cyber security routinely identify consumer-facing businesses as being particularly vulnerable to cyberattacks because of the value of the PII which they collect and maintain.

55. Several best practices have been identified that, at a minimum, should be implemented by major school and other university systems such as Canvas (and its third party vendors), including but not limited to: educating all employees about cyber security; requiring strong passwords; maintaining multi-layer security, including firewalls, anti-virus, and anti-malware software; utilizing encryption; making data unreadable without a key; implementing multi-factor authentication; backing up data; and limiting which particular employees can access sensitive data.

56. Other best cybersecurity practices that are standard in the industry include installing appropriate malware detection software; monitoring and limiting network ports; protecting web browsers and email management systems; setting up network systems such as firewalls, switches and routers; monitoring and protection of physical security systems; and training staff regarding critical points.

57. These foregoing frameworks are existing and applicable industry standards. Defendant failed to comply with these accepted standards, thereby opening the door to and causing the Data Breach.

***Defendant's Breaches of Its Obligations***

58. Defendant breached its obligations to Plaintiff and Class members and was otherwise negligent and/or reckless because it failed to properly maintain, oversee and safeguard relevant computer systems, network and data. In addition to its obligations under federal and state law, Defendant owed a duty to Plaintiff and the Class members to exercise reasonable care when

obtaining, retaining, securing, safeguarding, deleting, and protecting the PII it collected from being compromised, lost, stolen, accessed or misused by unauthorized persons. Defendant owed a duty to Plaintiff and Class members to provide reasonable security, including complying with industry standards and requirements, training for its staff and ensuring that their collective computer systems, networks, and protocols adequately protected the PII of Plaintiff and the Class members.

59. Defendant wrongful conduct includes, but is not limited to, the following acts and/or omissions:

a. Failing to maintain an adequate data security system to reduce the risk of data breaches and cyber-attacks;

b. Failing to adequately protect current or former consumers' PII;

c. Failing to properly monitor third-party data security systems for existing intrusions, brute-force attempts and clearing of event logs;

d. Failing to ensure that all third-parties apply all available and necessary security updates;

e. Failing to ensure that all third-parties install the latest software patches, update its firewalls, check user account privileges, or ensure proper security practices;

f. Failing to ensure that all third-parties practice the principle of least-privilege and maintain credential hygiene; and failing to avoid the use of domain-wide, admin-level service accounts;

g. Failing to adequately oversee third-party vendors;

h. Failing to ensure that all third-parties employ or enforce the use of strong randomized, just-in-time local administrator passwords; and

i. Failing to properly train and supervise third-parties in the proper handling of inbound emails.

60. As the result of allowing its computer systems to fall into dire need of security upgrading and its inadequate procedures for handling cybersecurity threats, Defendant negligently and wrongfully failed to safeguard Plaintiff's and Class members' PII.

61. Accordingly, as further detailed herein, Plaintiff and Class members now face a substantial, increased, and immediate risk of fraud, identity theft, and the disclosure of their most sensitive personal information.

***Data Breaches are Disruptive and Harm Victims***

62. The United States Government Accountability Office ("GAO") released a report in 2007 regarding data breaches ("GAO Report") in which it noted that victims of identity theft will face "substantial costs and time to repair the damage to their good name and credit record."

63. That is because all victims of a data breach may be exposed to serious ramifications regardless of the nature of the data. Indeed, the reason criminals steal PII is to monetize it because there is (unfortunately) a market for personally identifiable information, like the PII compromised by the Data Breach.

64. Cybercriminals do this by selling the spoils of their cyberattacks on the black market to identity thieves who desire to extort and harass victims, and to take over victims' identities in order to engage in illegal financial transactions under the victims' names. Because a person's identity is akin to a puzzle, the more accurate individual pieces of data an identity thief obtains regarding a person, the easier it is for that thief to take on the victim's identity, or otherwise harass or track the victim.

65. For example, armed with just a name and date of birth, a data thief can utilize a hacking technique referred to as "social engineering" to obtain even more information regarding a victim's identity, such as a person's login credentials or Social Security number. Social engineering is a form of hacking whereby a data thief uses previously acquired information to manipulate individuals into disclosing additional confidential or personal information through means such as spam phone calls and text messages or phishing emails.

66. A stolen Social Security number is a skeleton key to the victim's identity – and, therefore, the type of data that cyberthieves seek. Identity thieves can use a Social Security number for a variety of crimes, including credit card fraud, phone or utilities fraud, bank fraud, fraudulently obtaining a job, fraudulently renting a house, or filing a false police report.

67. Because of the threat of these harms, the FTC recommends that identity theft victims take several steps to protect their personal and financial information after a data breach, including contacting one of the credit bureaus to place a fraud alert (and potentially obtaining an extended fraud alert that lasts for 7 years if someone steals their identity), reviewing their credit reports, contacting companies to remove fraudulent charges from their accounts, placing a credit freeze on their credit, and correcting their credit reports.

68. Theft of PII is gravely serious.

69. PII is an extremely valuable property right.

70. Its value is axiomatic, considering the value of "big data" in corporate America and the fact that the consequences of cyber thefts include heavy prison sentences. Even this obvious risk to reward analysis illustrates that PII has considerable market value.

71. According to the GAO:

> [L]aw enforcement officials told us that in some cases, stolen data may be held for up to a year or more before being used to commit identity theft. Further, once stolen

> data have been sold or posted on the Web, fraudulent use of that information may continue for years. As a result, studies that attempt to measure the harm resulting from data breaches cannot necessarily rule out all future harm.

*See* GAO Report, at p. 29.

72. Private information, such as the PII compromised herein, is such a valuable commodity to identity thieves that once the information has been compromised, criminals often trade the information on the "cyber black-market" for years. The private information of consumers remains of high value to criminals, as evidenced by the prices paid through the dark web. Numerous sources cite dark web pricing for stolen identity credentials. For example, private information (inclusive of a Social Security number) can be sold at a price from $40 to $200, and bank details have a price range of $50 to $200. Experian reports that a stolen credit card or debit card number can sell between $5 to $110 on the dark web. Clearly, all this data has real value – which is why it was targeted and stolen in the first place.

73. Because of the value of the PII compromised in the Data Breach, there is a strong probability that entire batches of information stolen in the Data Breach have been dumped on the black market, as that is the *modus operandi* of cybercriminals who perpetrate data breaches, while other batches have yet to be dumped on the black market, meaning Plaintiff and Class members are at a substantial imminent risk of injury including an increased risk of fraud and identity theft for many years into the future.

74. Thus, Plaintiff and Class members must vigilantly monitor their financial, medical, and other accounts and other indices of identity theft (*i.e.*, the mail, email, etc.) for many years to come.

***Harm to Plaintiff and the Class***

75. Plaintiff was a student at one more schools since 2018 which used Canvas in order to maintain oversight over his educational experience.

76. As a result of being informed about the Data Breach, Plaintiff has commenced making reasonable efforts to mitigate the impact of the Data Breach, including but not limited to researching the Data Breach, and reviewing reports and his financial account statements for any indications of actual or attempted identity theft or fraud. Plaintiff has already spent time dealing with the Data Breach, valuable time Plaintiff otherwise would have spent on other activities.

77. Plaintiff suffered actual injury from having his PII compromised as a result of the Data Breach including, but not limited to (a) actual misuse of his compromised PII; (b) damage to and diminution in the value of his PII, a form of property that Defendant obtained from Plaintiff; (c) violation of his privacy, including the compromise of highly sensitive PII such as, for example, his Social Security number and PHI in combination with name and other private information; (d) present, imminent and impending injury arising from the increased risk of identity theft and fraud; and (e) actual and potential out-of-pocket losses including the loss of time, as Plaintiff has spent multiple hours dealing with the repercussions of the Data Breach, due to time spent mitigating the actual and potential harms caused by the Data Breach.

## CLASS ALLEGATIONS

78. Plaintiff Hinds brings this nationwide class on behalf of himself and on behalf of all others similarly situated pursuant to Rule 23(b)(2), 23(b)(3), and 23(c)(4) of the Federal Rules of Civil Procedure. The "Class" that the Plaintiff seeks to represent is defined as follows:

> **Class Definition.** All persons whose PII was maintained by Canvas and was compromised in the Data Breach.

79. Excluded from the Class are Defendant and Defendant's subsidiaries, affiliates, officers and directors, and any entity in which the Defendant has a controlling interest; and all judges assigned to hear any aspect of this litigation, as well as their immediate family members.

80. Plaintiff reserves the right to modify or amend the definition of the proposed Class before the Court determines whether certification is appropriate.

81. **Numerosity**. Upon information and belief, there are at least millions of additional victims of this Data Breach spread out throughout the United States. Therefore, the members of the Class are so numerous that joinder of all members is impractical.

82. **Commonality**. There are questions of law and fact common to the Class, which predominate over any questions affecting only individual Class members. These common questions of law and fact include, without limitation:

a. Whether Defendant unlawfully used, maintained, lost or disclosed Plaintiff's and Class members' PII;

b. Whether Defendant (and/or its third-party vendors) failed to implement and maintain reasonable security procedures and practices appropriate to the nature and scope of the information compromised in the Data Breach;

c. Whether Defendant's (and its third-party vendors') data security systems prior to and during the Data Breach complied with applicable data security laws and regulations;

d. Whether Defendant's (and its third-party vendors') data security systems prior to and during the Data Breach were consistent with industry standards;

e. Whether Defendant owed a duty to Plaintiff and Class members to safeguard their PII;

f. Whether Defendant breached its duty to Plaintiff and Class members to safeguard their PII;

g. Whether computer hackers obtained Plaintiff's and Class members' PII in the Data Breach;

h. Whether Defendant knew or should have known that its (and its third-party vendors') data security systems and monitoring processes were deficient;

i. Whether Plaintiff and Class members suffered legally cognizable damages as a result of Defendant's misconduct;

j. Whether Defendant's acts, inactions, and practices complained of herein amount to common law negligence;

k. Whether Defendant failed to provide notice of the Data Breach in a timely and proper manner; and

l. Whether Plaintiff and Class members are entitled to damages, civil penalties, punitive damages, equitable relief and/or injunctive relief.

83. **Typicality**. Plaintiff's claims are typical of those of other Class members because Plaintiff's PII, like that of every other Class member, was compromised by the Data Breach. Further, Plaintiff, like all Class members, was injured by Defendant's uniform conduct. Plaintiff is advancing the same claims and legal theories on behalf of himself and all other Class members, and there are no defenses that are unique to Plaintiff. The claims of Plaintiff and those of other Class members arise from the same operative facts and are based on the same legal theories.

84. **Adequacy of Representation**. Plaintiff will fairly and adequately represent and protect the interests of the Class in that they have no disabling or disqualifying conflicts of interest that would be antagonistic to those of the other members of the Class. The damages and infringement of rights Plaintiff suffered are typical of the other Class members, and Plaintiff seeks no relief that is antagonistic or adverse to the members of the Class. Plaintiff has retained counsel experienced in complex class action litigation, including, but not limited to, data privacy class action litigation, and Plaintiff intends to prosecute this action vigorously.

85. **Superiority of Class Action**. A class action is superior to other available methods for the fair and efficient adjudication of this controversy, as the pursuit of numerous individual

lawsuits would not be economically feasible for individual Class members, and certification as a class action will preserve judicial resources by allowing the Class's common issues to be adjudicated in a single forum, avoiding the need for duplicative hearings and discovery in individual actions that are based upon an identical set of facts. Without a class action, it is likely that many members of the Class will remain unaware of the claims they may possess.

86. The litigation of the claims brought herein is manageable. Defendant's uniform conduct, the consistent provisions of the relevant laws and the ascertainable identities of Class members demonstrates that there would be no significant manageability problems with prosecuting this lawsuit as a class action.

87. Adequate notice can be given to Class members directly using information maintained in Defendant's records.

88. **Predominance**. The issues in this action are appropriate for certification because such claims present only particular, common issues, the resolution of which would advance the disposition of this matter and the parties' interests therein. Defendant has engaged in a common course of conduct toward Plaintiff and Class members. The common issues arising from Defendant's conduct affecting Class members set out above predominate over any individualized issues. Adjudication of these issues in a single action has important and desirable advantages of judicial economy.

89. This proposed class action does not present any unique management difficulties.

## COUNT I

## NEGLIGENCE

90. Plaintiff and the Class repeat and re-allege each and every allegation as if fully set forth herein.

91. Defendants owed a duty to Plaintiff and the members of the Class to take reasonable care in managing and protecting the sensitive data it solicited from Plaintiff and the Class, managed and stored. This duty arises from multiple sources.

92. Defendants owed a common law duty to Plaintiff and the Class to implement reasonable data security measures because it was foreseeable that hackers would target Defendants databases because it contained millions of individuals' valuable PII and, Defendants further knew that, should a breach occur, Plaintiff and the Class would be harmed. Defendants alone controlled its technology, infrastructure, digital platforms, and cybersecurity that were exposed during the Data Breach and allowed hackers to breach and steal information from its database. It further knew or should have known that if hackers breached its data systems, they would extract sensitive data and inflict injury upon Plaintiff and the Class. Defendants knew or should have known that if hackers accessed the sensitive data, the responsibility for remediating and mitigating the consequences of the breach would largely fall on individual persons whose data was impacted and stolen, and that individual need would continue long after the Data Breach ended. Therefore, the Data Breach, and the harm it caused Plaintiff and the Class, was the foreseeable consequence of Defendants's unsecured, unreasonable data security measures.

93. Defendants, furthermore, assumed a duty to protect individuals' data by soliciting sensitive PII, collecting that data, and storing that data in its own databases. In fact, Plaintiff and the Class were required to provide PII in order to obtain employment or apply to attend Defendants. Defendants was the only entity capable of implementing reasonable measures to protect Plaintiff's and the Class's sensitive data.

94. Additionally, Section 5 of the Federal Trade Commission Act ("FTCA"), 15 U.S.C. § 45, required Defendants to take reasonable measures to protect Plaintiff's and the Class's

sensitive data and is a further source of Defendants' duty to Plaintiff and the Class. Section 5 prohibits unfair practices in or affecting commerce, including, as interpreted and enforced by the FTC, the unfair act or practice by entities like Defendants of failing to implement and use reasonable measures to protect sensitive data. Defendants, therefore, was required and obligated to take reasonable measures to protect data it possessed, held, or otherwise used. The FTC publications and data security breach orders described herein further form the basis of Defendants' duty to adequately protect sensitive information. By failing to implement and use reasonable data security measures, Defendants acted in violation of § 5 of the FTCA.

95. Defendants are obligated to perform its business operations in accordance with industry standards. Industry standards are another source of duty and obligations requiring Defendants to exercise reasonable care with respect to Plaintiff and the Class by implementing reasonable data security measures that do not create a foreseeable risk of harm to Plaintiff and the Class. Industry best practices put the onus of adequate cybersecurity on the entity most capable of preventing a Data Breach. In this case, Defendants were the only entity capable of adequately protecting the data that it alone solicited, collected, and stored.

96. Defendants breached its duty to Plaintiff and the Class by implementing unreasonable data security measures that it knew or should have known could cause a Data Breach. Defendants recognized the need to keep PII confidential and safe from cybercriminals who targeted it. Despite that, Defendants implemented unreasonable data security that allowed a single hacker to breach its systems, gain control over them, access its database, and exfiltrate data on millions of individuals, all undetected.

97. Defendants was fully capable of preventing the Data Breach. Defendants were or are sophisticated entities that knew or should have known of data security measures required or

recommended by the FTC, state laws and guidelines, and other data security experts which, if implemented and used, would have prevented the Data Breach from occurring at all, or limited and shortened the scope of the Data Breach. Defendants thus failed to take reasonable measures to secure its system, leaving it vulnerable to a breach.

98. As a direct and proximate result of Defendants' negligence, Plaintiff and the Class have suffered and will continue to suffer injury, including the ongoing risk that their data will be used nefariously against them or for fraudulent purposes. Plaintiff, therefore, seeks all remedies available under the law for Defendants negligence.

## COUNT II

## NEGLIGENCE PER SE

99. Plaintiff repeats and re-alleges each and every allegation as if fully set forth herein.

100. Defendants unreasonable data security measures and failure to timely notify Plaintiff and the Class of the Data Breach violates Section 5 of the FTC Act. Although the FTC Act does not create a private right of action, both require businesses to institute reasonable data security measures and breach notification procedures, which Defendants failed to do.

101. Section 5 of the FTCA, 15 U.S.C. §45, prohibits "unfair. . . practices in or affecting commerce" including, as interpreted and enforced by the FTC, the unfair act or practice by entities like Canvas of failing to implement and use reasonable measures to protect individuals' sensitive data. The FTC publications and orders described above also form the basis of Defendants' duty.

102. Defendants violated Section 5 of the FTC Act by failing to use reasonable measures to protect Plaintiff's and the Class's PII and sensitive data and by not complying with applicable industry standards. Defendants conduct was particularly unreasonable given the sensitive nature

and amount of data it stored on its databases and the foreseeable consequences of a Data Breach should Defendants fail to secure its systems.

103. Defendants' violation of Section 5 of the FTC Act constitutes negligence per se.

104. Plaintiff and the Class are within the class of persons Section 5 of the FTCA (and similar state statutes) was intended to protect. Indeed, the FTC has pursued over fifty enforcement actions against businesses which, as a result of their failure to employ reasonable data security measures and avoid unfair and deceptive practices, caused the same type of harm suffered by Plaintiff and the Class.

105. As a direct and proximate result of Defendants' negligence per se, Plaintiff and the Class have suffered and continue to suffer injury. Plaintiff, therefore, seeks all remedies available under the law for Defendants' negligence per se.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff, on his own behalf and on behalf of all others similarly situated, prays for relief as follows:

A. For an Order certifying this case as a class action, appointing Plaintiff as the lead plaintiff in this Action, and appointing Plaintiff's below-listed counsel as lead counsel in this Action;

B. For an award of restitution, actual damages, compensatory damages, statutory damages, nominal damages and statutory penalties, in an amount to be determined, as allowable by law;

C. For an award of equitable and injunctive relief;

D. For injunctive and other equitable relief to ensure the protection of the sensitive information of Plaintiff and the Class which remains in Defendant's possession;

E. For an award of attorneys' fees and costs;

F. For pre- and post-judgment interest on any amounts awarded; and

G. For such other and further relief as the Court may deem just and proper.

**JURY TRIAL DEMAND**

106. Plaintiff hereby demands a trial by jury of all claims so triable.

**DATED:** May 8, 2026

Respectfully submitted,

*/s/ Blake Hunter Yagman*
Blake Hunter Yagman
YAGMAN PLLC
118-35 Queens Boulevard, Suite 444
Forest Hills, New York, 1137
Tel.: (929) 709-1493
Email: blake.yagman@yagmanpllc.com